[Cite as *State v. Prouty*, 2026-Ohio-2239.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

v.

RANDY D. PROUTY,

    DEFENDANT-APPELLANT.

CASE NO. 1-25-57

OPINION AND
JUDGMENT ENTRY

---

Appeal from Allen County Common Pleas Court
Trial Court No. CR2024 0256

Judgment Affirmed

Date of Decision: June 15, 2026

---

APPEARANCES:

    *William T. Cramer* for Appellant

    *John R. Willamowski, Jr.* for Appellee

**WALDICK, J.**

{¶1} Defendant-appellant, Randy D. Prouty ("Prouty"), brings this appeal from the September 5, 2025, judgment of the Allen County Common Pleas Court sentencing him to life in prison without parole after he was convicted by a jury of, *inter alia*, Rape of a child under ten years old. For the reasons that follow, we affirm the judgment of the trial court.

*Background*

{¶2} After D.K.'s mother had a debilitating heart attack, D.K. and his younger brother went to live with Prouty while children's services completed a home-study on D.K.'s relatives in Kentucky. Prouty was D.K.'s neighbor.

{¶3} In the fall of 2024, D.K. was in first grade and Prouty walked him to school. On October 28, 2024, a school social worker spoke with Prouty because D.K. really wanted to attend an after-school party, but D.K. was not brought back for the party.

{¶4} The next morning, on October 29, 2024, D.K. was overheard in class talking about "putting [a] penis in girls' mouths." D.K. was sent to speak with the school social worker, and during that conversation, D.K. disclosed that Prouty had put his penis in D.K.'s mouth the prior evening. D.K. also disclosed that Prouty had shown him pornography on Prouty's phone.

**{¶5}** The school social worker called children's services and D.K. was taken to a forensic interview at a child advocacy center. The interview was conducted without law enforcement present. During the interview, D.K. disclosed that the prior night Prouty had shown him "what boys do" with each other. More specifically, D.K. indicated that Prouty put his "private" in D.K.'s mouth, that Prouty directed D.K. to "massage" Prouty's "private," and that Prouty directed D.K. to massage his "butt." D.K. indicated that "privates" were what boys "used to pee."

**{¶6}** Prouty was interviewed three times by law enforcement, and all of those interviews were recorded. Prouty initially adamantly denied that anything happened. Next, he claimed that D.K. approached Prouty and indicated some homosexual tendencies, so Prouty showed D.K. homosexual pornography to illustrate "what boys do with each other." Prouty later changed his story and admitted that he was the one that brought up "what boys do" with each other to D.K., and he admitted showing D.K. the pornography.[1]

**{¶7}** Prouty initially maintained he did not touch D.K. and that he did not have D.K. touch him. However, Prouty eventually admitted that he had D.K. touch his penis, but he said that was all that happened. At the conclusion of the third interview, Prouty wrote the following letter of apology to D.K.

---

[1] An analysis of Prouty's phone established that Prouty had searched for multiple homosexual pornography videos around the time he was alleged to have shown the videos to D.K.

Dear [D.K.]

Uncle [Prouty] is so so sorry about having you touch my taliwaker [sic] and showing you the porn video. I had some Beer that day, so I wasn't thinking straight. So I'm writing you this letter to tell you that I'm not mad at you at all. I love you and [other child] very much. You two are like my owen [sic] kids. Like I said I'm so so sorry. I'll never ever do this again.

Your
Uncle [Prouty]

(State's Ex. 25).

{¶8} The detective investigating the matter collected Prouty's shorts after the first interview because they were the same shorts Prouty had been wearing the day prior when the sexual assault allegedly occurred. Prouty had indicated he had not showered since the alleged event. The shorts were sent to BCI for testing and a mixture of DNA was found on the interior crotch region of the shorts. The mixture of DNA contained Prouty's DNA and D.K.'s DNA.

{¶9} On December 12, 2024, Prouty was indicted for Disseminating Matter Harmful to Juveniles in violation of R.C. 2907.31(A)(1), a fourth degree felony, two counts of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), both third degree felonies, and Rape in violation of R.C. 2907.02(A)(1)(b), a first degree felony. Prouty pled not guilty to the charge.

{¶10} A jury trial was held September 2-4, 2025. At trial, the State presented testimony from the school social worker, the nurse who conducted the sexual assault

exam of D.K., the forensic interviewer who interviewed D.K., a BCI forensic scientist who did the DNA analysis, and the detective investigating the matter. A redacted version of the forensic interview with D.K. was introduced into evidence, as were the recorded interviews with D.K. Ultimately the jury found Prouty guilty of all charges.

{¶11} The case proceeded immediately to sentencing. With regard to the Rape conviction, Prouty was sentenced to life in prison without parole pursuant to R.C. 2907.02(B). He received prison terms on his other charges, but those terms were ordered to be served concurrently with the prison term for the Rape conviction. A judgment entry memorializing Prouty's sentence was filed the next day, September 5, 2025. It is from this judgment that Prouty appeals, asserting the following assignments of error for our review.

**First Assignment of Error**

**The trial court violated appellant's confrontation rights under the federal and state constitutions, and the hearsay rule, by admitting into evidence the child-victim's forensic interview.**

**Second Assignment of Error**

**Appellant's sentence of life without parole for a single act of rape violates the state and federal constitutional prohibitions on cruel and unusual punishment.**

*First Assignment of Error*

**{¶12}** In his first assignment of error, Prouty argues that his federal and state rights to confront witnesses against him were violated by the admission of a redacted video recording of the forensic interview of D.K., who did not testify at trial. Prouty also separately argues that the video recording constituted inadmissible hearsay.

Standards of Review

**{¶13}** We review Prouty's challenge to the admission of the forensic interview under the Confrontation Clause de novo. *See State v. McKelton*, 2016-Ohio-5735, ¶ 172 (stating that challenges to Sixth Amendment rights are reviewed de novo). By contrast, hearsay challenges are typically reviewed under the abuse of discretion standard, giving deference to the trial court's decision. *State v. Wilson*, 2026-Ohio-1178, ¶ 4 (1st Dist.). Under an abuse of discretion standard, we will not reverse the trial court's judgment unless the judgment was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Notably, the Confrontation Clause may bar the admission of evidence that would otherwise be admissible under an exception to the hearsay rule. *State v. Issa*, 2001-Ohio-1290.

Analysis

**{¶14}** The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Section 10, Article I of the Ohio Constitution, which includes the right "to meet face to face" provides "no greater right of confrontation than the Sixth Amendment." *State v. Self*, 56 Ohio St.3d 73, 79 (1990).

**{¶15}** Under the Confrontation Clause, testimonial out-of-court statements are prohibited, unless the witness is unavailable to testify and the defendant has had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004); *State v. Tench*, 2018-Ohio-5205, ¶ 17. *Crawford* did not define "testimonial," but it is generally understood that testimonial statements are those made for "a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344 (2011); *State v. Maxwell*, 2014-Ohio-1019, ¶ 40.

**{¶16}** In *State v. Arnold*, 2010-Ohio-2742, the Supreme Court of Ohio addressed whether recorded statements made by a child at a child advocacy center were testimonial and thus inadmissible pursuant to the Confrontation Clause when the child was unavailable for cross-examination at trial. The Court noted that child advocacy centers are unique in that multidisciplinary teams cooperate so that the

child is interviewed only once. *Arnold* at ¶ 33. Generally, the interviews at child advocacy centers serve dual purposes: (1) to gather forensic information needed by the team for investigation and potential prosecution, and (2) to elicit information necessary for medical diagnosis and treatment. *Id*.

{¶17} The Supreme Court of Ohio held that statements made to the interviewer that served primarily a forensic or investigative purpose were testimonial, whereas those made for medical diagnosis and treatment were not. *Id.* at paragraphs one and two of the syllabus, ¶ 44. The Supreme Court noted that "the fact that police officers watched the interview and that it was recorded does not change the fact that the statements were necessary for [the child's] medical diagnosis and treatment. Similarly, the fact that information gathered for medical purposes is subsequently used by the state does not change the fact that the statements were made for medical diagnosis and treatment." *Id.* at ¶ 43.

{¶18} Shortly after *Arnold* was issued, this Court affirmed a trial court's exclusion of a child's statements that were made in an interview with a social worker with Logan County Children Services. *State v. Goings*, 2012-Ohio-1793 (3d Dist.). In *Goings*, the social worker testified that the purpose of the interview was to determine the veracity of the allegations and whether the child required medical or emotional treatment. Based on the child's statements during the interview, the social worker recommended that the child be taken to the hospital, but indicated it was not an emergency to do so. No information was forwarded to a medical facility or

medical professional, and the social worker was not working with a medical professional; to the contrary, the social worker contacted the police following the interview. We concluded that "nothing in the interview supports a conclusion that any part of the interview was directed to medical diagnosis or treatment[.]" *Goings* at ¶ 34.

{¶19} However, *Goings* is markedly different from the case *sub judice*. This case is more similar to *State v. Smith*, 2023-Ohio-1613 (3d Dist.), wherein a child was interviewed by a licensed social worker/forensic interviewer at a child advocacy center, and the interviewer was attempting to gather information about suspected abuse or neglect for medical diagnosis and treatment. The interviewer interacted with doctors regarding the allegations prior to the interview and received feedback from them during the interview. There was no law enforcement presence at the interview. In such circumstances, we determined that the child's statements during the interview were for the purposes of medical diagnosis and treatment, and there was no indication the forensic interviewer was acting on behalf of law enforcement. *Smith* at ¶ 39. Therefore, we concluded that entering a recording of the interview into evidence did not violate the Confrontation Clause. *Id*.

{¶20} The instant case is very similar to *Smith*. In this case, D.K. was interviewed by a social worker trained in conducting forensic interviews. The interview was also done at a child advocacy center with no law enforcement officers present.

**{¶21}** Moreover, the interview, particularly the portions presented to the jury, covered questions related to determining what medical treatment or medical evaluations the child might need. Furthermore, also like *Smith*, the interview with D.K. was redacted so that only portions pertinent to medical treatment were included in the recording presented to the jury. Just as in *Smith*, the statements in this case were made primarily for the purposes of medical diagnosis and evaluation; therefore, we find that their inclusion into evidence does not violate the Confrontation Clause because they were not testimonial in nature.

**{¶22}** Having determined that the recording as redacted did not violate the Confrontation Clause, we must still address whether the recording constituted inadmissible hearsay. Evidence Rule 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Hearsay is generally not admissible unless an exception applies. Evid.R. 802.

**{¶23}** Evidence Rule 803 contains exceptions to the general rule that hearsay is not admissible. As relevant to this case, Evidence Rule 803(4), reads as follows:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . .
>
> (4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present

symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

{¶24} Here, we have already determined that the interview of D.K. that was introduced into evidence contained statements made for purposes of medical diagnosis or treatment. As there is a clear exception to the general hearsay rule for this purpose, we can find no abuse of discretion by the trial court in this matter in determining that the redacted interview was admissible under Evid.R. 803(4). Thus Prouty's argument is not well-taken.

{¶25} Having rejected both of Prouty's challenges to the recorded interview of D.K., his first assignment of error is overruled.

*Second Assignment of Error*

{¶26} In his second assignment of error, Prouty argues that his sentence of life in prison without parole for a single act of rape of a child under ten violates state and federal prohibitions on cruel and unusual punishment.

Standard of Review

{¶27} Prouty did not object to his sentence as cruel and unusual punishment at the trial court level, thus we review the matter for plain error. *State v. Blanton*, 2025-Ohio-1192, ¶ 60 (1st Dist.).

Analysis

**{¶28}** The Supreme Court of Ohio has held, "As a general rule, a sentence that falls within the terms of a valid statute cannot amount to a cruel and unusual punishment." *McDougle v. Maxwell*, 1 Ohio St.2d 68, 69 (1964). Because the sentence imposed in this case is consistent with what is required by R.C. 2907.02, the sentence generally cannot constitute cruel and unusual punishment. *State v. Kidd*, 2021 Ohio App. LEXIS 3803 (1st Dist.).

**{¶29}** Notwithstanding the first point, Ohio Appellate Courts have repeatedly rejected arguments that sentences to life in prison without parole constitute cruel and unusual punishment for the crime of raping a child under ten. *Kidd*, *supra*, (1st Dist.); *State v. Driscoll*, 2009-Ohio-6134, ¶ 29 (2d Dist.); *State v. Glaze*, 2019-Ohio-53, ¶ 26 (6th Dist.); *State v. Gladding*, 66 Ohio App.3d 502, 513 (11th Dist.1990). These Ohio Appellate Courts repeatedly refer to the nature of raping a child under ten as particularly "heinous," and then find that life imprisonment without parole for such a "heinous" crime is not "shocking to the moral sense of the community." We agree with the other Ohio Appellate Districts.

**{¶30}** Given the heinous nature of the crime, the age of the child, seven at the time of the Rape, and the consistent case authority finding that the sentence imposed herein does not constitute cruel and unusual punishment for the crime

committed, we find no error with the trial court's sentence in this matter. Therefore, Prouty's second assignment of error is overruled.

*Conclusion*

{¶31} Having found no error prejudicial to Prouty in the particulars assigned and argued his assignments of error are overruled and the judgment of the Allen County Common Pleas Court is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and MILLER, J., concur.**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.  The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.

 

Juergen A. Waldick, Judge

 

William R. Zimmerman, Judge

 

Mark C. Miller, Judge

DATED:
/jlm